### IN THE UNITED STATES DISTRICT COURT FOR THE
### District of Columbia

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:23-cr-00388-RDM |
| | ) | |
| JARED L. OWENS | ) | |
| | ) | |
| Defendant. | ) | |

### *JARED OWENS' MOTION TO TRANSFER VENUE AND MEMORANDUM OF LAW*

**COMES NOW** the Defendant, Jared Owens, through his attorneys under Rule 21 of the Federal Rules of Criminal Procedure, and the Fifth and Sixth Amendments to the United States Constitution, and respectfully moves for a change of venue to ensure a fair trial by an impartial jury without the significant prejudice that exists in the current jury pool. Defendant, Owens (Owens or Defendant) asks the Court to move his trial outside the District of D.C. to the appropriate alternative venue of Western District of Missouri where he resides, where he was arrested, and where witnesses for the Defense reside.

### PROCEDURAL HISTORY

On November 8, 2023, a grand jury in the District of Columbia issued an eight count Indictment, charging Defendant Jared Owens with Civil Disorder, in violation of 18 U.S.C § 231(a)(3); Assaulting/Resisting/Impeding Officers/Employees, in violation of 18 USC § 111(a)(1) and (b) and 2; three counts of Entering and Remaining in a

Restricted Building or Grounds, in violation of 18 USC § 1752(a)(1), (2) and (4);

Disorderly conduct on Capital Grounds, in violation of  40 USC § 5104(e)(2)(D); Acts of

Physical Violence in a Capitol Ground or Building, in violation of 40 USC §5104(e)(2)(F);

and Parading, Demonstrating, or picketing in a Capitol Building, in violation of 40 USC

§5104(e)(2)(G).

Owens pleaded Not Guilty and remains out on bond living in his home in

Missouri.

## MEMORANDUM OF LAW

The Sixth Amendment to the United States Constitution grants criminal

defendants the right to a fair trial by an impartial jury.  *Duncan v. Louisiana*, 391 U.S.

145 (1968).  The great value of a trial by jury consists in its fairness and impartiality. An

impartial jury is required under the Constitution and has been required since the times

of common law. *Id.; see also Patton v. Yount, 467 U.S. 1025 (1984).*

A criminal trial ordinarily should take place in the district where the offense was

committed.   *U.S. Const. amend. VI; Fed. R. Crim. P. 18.*   If extraordinary local

prejudice will prevent the defendant from obtaining a fair trial in the district of the

offense, then due process requires transferring the trial to another alternative venue.

*Skilling v. United States*, 130 S. Ct. 2896 (2010).   For these situations, the Federal

Rules of Criminal Procedure have long provided a mechanism to enable a defendant

to seek a change of venue.  Federal Rule of Criminal Procedure Rule 21 allows a

defendant to initiate a motion, dependent upon the court's discretion, for transfer of a

criminal case for trial in another district, if (a) the atmosphere is so prejudicial the

defendant cannot obtain a fair and impartial trial within the district in which the action is

brought or (b) for the convenience of the parties and witnesses, if in the interest of justice.  The rule should secure a fair trial to the defendant when circumstances in the district where the action is brought would place an undue risk of unfairness upon the defendant if tried within that district. *Sheppard v. Maxwell*, 384 U.S. 333 (1965).

I.  FRCP RULE 21 (A) PROVIDES THAT THE COURT **MUST** TRANSFER THE PROCEEDING AGAINST OWENS TO ANOTHER DISTRICT BECAUSE THE PREJUDICE AGAINST OWENS IS SO GREAT IN THE TRANSFERRING DISTRICT THAT THE OWENS CANNOT OBTAIN A FAIR AND IMPARTIAL TRIAL THERE.

Federal Rule of Criminal Procedure 21 (a) states that upon a defendant's motion, the court **must** transfer the proceeding against that defendant to another district if the court is satisfied so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there. The defendant carries a substantial burden in establishing that pretrial prejudice is —so great that continuances, gag orders, voir dire, and other safeguards are insufficient to preserve the right to a fair trial. See *United States v. Ayala*, 64 F. Supp. 3d 446, 450 (E.D.N.Y. 2014). Although cases granting motions to transfer under Rule 21(a)are rare, the circumstances mandating the transfer are unprecedented and require such a result.

The courts have recognized two types of prejudice that support a motion to transfer venue: *presumed prejudice* and *actual prejudice*. *Hayes v. Ayers*, 632 F.3d 500, 508 (9th Cir. 2011) (quoting *United States v. Sherwood*, 98 F.3d 402, 410 (9th Cir. 1996)).  Presumed prejudice refers to the conditions that exist before trial in this district; the court will typically consider whether there was a barrage of inflammatory publicity, whether news accounts were factual or opinionated, whether those accounts included material that would not be admissible, the size of the overall jury pool, and the

availability of judicial tools to mitigate the prejudicial effect of pretrial publicity. Prejudice may be presumed "when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir. 1988). Prejudice should be presumed in only extreme cases. *Harris*, 885 F.2d at 1361 (presumed prejudice is rarely applicable and reserved for an extreme situations). Actual prejudice focuses on whether the opinions expressed by particular potential jurors in jury selection demonstrate impermissible bias. Actual prejudice also occurs when the voir dire did not adequately detect and defuse juror bias.

In Washington, D.C., the presumed prejudice against Owens is so great that a fair and impartial trial is impossible. The D.C. potential jury pool has been tainted without cure singularly that is unparalleled in legal history. In D.C., the media coverage of the J6 events and the effects thereof saturate the public with prejudicial and inflammatory publicity. This detrimental pretrial publicity has created widespread community prejudice against anyone accused of participating in the events on January 6, 2021.

The potential jury members come from the most politically uniform community in the entire country. In the District of Columbia, 94.6% of voters voted against Donald Trump.[1] Similarly, in the 2016 Presidential Election, 95.9% of District of Columbia voters voted against Donald Trump.[2] In both elections, the Democratic candidate

---

[1] 2020 Election Results, DCBOE, https://electionresults.dcboe.org/election_results/2020-General-Election (last visited October 20, 2024).
[2] 2016 Election Results, DCBOE, https://electionresults.dcboe.org/election_results/2016-General-Election (last visited October 20, 2024).

received over 90% of the vote.[3] There is an absolute lack of political diversity in D.C. that is sui generis in our political system.  While in most criminal cases this unique political landscape would be irrelevant, in this case it cuts to the heart of the characteristics of this community.   This case has a political aspect that cannot be denied. Politics today are polarized and therefore this aspect of the transferring districts community is dispositive to the analysis for change of venue.

The Supreme Court has overturned convictions where the district court failed to transfer for venue after prejudicial pretrial publicity. *See e.g. Rideau v. Louisiana,* 373U.S. 723 (1963); *Estes v. State of Texas,* 381 U.S. 532 (1965); *Sheppard v. Maxwell,* 384 U.S. 333 (1966). The Supreme Court has also reversed convictions where there was a "huge…wave of public passion and where the venire possessed —a belief in [defendant's] guilt." *Irvin v. Dowd,* 366 U.S. 717, 728 (1961)(vacating a conviction and death sentence for the trial court's failure to transfer venue for community publicity); see also *Patton v. Yount*, 467 U.S. 1025 (1984).

II.    THE SKILLING FACTORS

In the prosecution of Jeffrey Skilling, former chief financial officer of Enron, the defense moved for change of venue based on the localized hostility towards him in Houston and the extensive pretrial publicity that poisoned the potential jury pool.  The Southern District Court of Texas denied Skilling's motion to transfer venue and he was ultimately convicted.  On appeal, the Fifth Circuit held that the volume and negative tone generated by Enron's collapse had created a presumption of juror prejudice but found the presumption had been rebutted because the district court had conducted a thorough

---

[3] See Id.

jury selection process. The case went up to the Supreme Court.

In *Skilling v. United States,* 561 U.S. 358 (2010), the Supreme Court rejected the Skilling's claims on both presumed and actual prejudice. Regarding presumed prejudice, the court held that even pervasive adverse pretrial publicity does not *inevitably* lead to an unfair trial. There, the court noted that the news stories about Enron and Skilling had no confessions or present the vivid and unforgettable information likely to produce prejudice. The court also noted that four years had elapsed between Enron's bankruptcy and Skilling's trial as well as the size and diversity of the potential jury pool in Houston would not render it impossible to find 12 impartial individuals.

The *Skilling* court laid out factors to be considered in determining the appropriateness of change of venue. *See Skilling v, United States,* 561U.S. 358 (2010). The factors in *Skilling* relevant to an analysis of presumed prejudice due to pretrial publicity are: (1) The size and characteristics of the community in which the crime occurred; (2) The nature and extent of pretrial publicity; (3) The proximity of time between the publicity and the trial; and (4) Evidence of juror partiality such as when the jury acquits the defendant of some of the alleged crimes.[7]

### III.    ANALYSIS OF SKILLING FACTORS

#### A.  SIZE AND CHARACTERISTICS OF THE COMMUNITY

Washington D.C. provides a small, uniform pool of people when compared to the size and characteristics of Skilling's "large, diverse pool" of 4.5 million eligible jurors in Houston, the fourth largest city in America. *Skilling,* 561 U.S. at 382.  Venue survey data obtained during January 2022 demonstrated that 73% of D.C. voters who participated

in an online survey believe that any individual who was inside the US Capitol on January 6 should be convicted of insurrection - a charge not even the Government has levied.[4]

## B.  NATURE AND EXTENT OF PRETRIAL PUBLICITY

The nature of the media coverage over J6 has been negative, vivid, and unforgettable.  The extent of the negative pretrial publicity is pervasive and perhaps more than any other event in American history.  Every local D.C. and national politician has made negative statements referring to the individuals involved in the January 6 incident as —white supremacists and —insurrectionists. D.C. residents have been bombarded with 24-hour coverage of the January 6 incident with constant updates of arrests, criminal charges, and prosecutorial outcomes.

President Biden referred to Trump supporters involved in the January 6 incident as a group of thugs, insurrectionists, political extremists, and white supremacists.[5] The D.C. jury pool, already adverse to Trump supporters, has been programmed to believe by their party's political leaders that the January 6 incident was a white supremacist insurrection and a domestic terror attack. This message programming was further magnified by Attorney General Merrick Garland. He stated, a line connected the January insurrection to the Oklahoma City Bombing and back to the battles of the original Justice Department against the Ku Klux Klan.[6]

In addition to negative publicity, DC residents have been inundated with reminders of J6 in their daily lives considering the National Guard's deployment to

---

[4] Results from John Zogby online survey in the case of United States v. Gabriel Garcia, 1:21-CR-129
[5] Remarks by President Biden at Signing of an Executive Order on Racial Equity, The White House (2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/01/26/remarks-by-president-biden-at-signing- of-an-executive-order-on-racial-equity/ (last visited October 20, 2024)
[6] Merrick Garland ties Oklahoma City bombing to Capital riot (yahoo.com)(June 15, 2021)

Washington D.C. for over 4 months after the incident. At least 26,000 National Guard troops took over D.C.  There was also a curfew in place as well as road and bridge closures for months. D.C. residents were told that their inconvenience and restrictions was the fault of the January 6 defendants. Every potential juror in the District was negatively affected by the events of January 6.  Vice President Harris compared it to Pearl Harbor and September 11 when she said that certain dates echo throughout history, including dates that instantly remind all who have lived through them "where they were and what they were doing when our democracy came under assault. Dates that occupy not only a place on our calendars, but a place in our collective memory: December 7, 1941, September 11, 2001, and January 6, 2021."[7]

President Biden has also made statements referencing Trump supporters involved in the January 6 incident as "a group of thugs, insurrectionists, political extremists, and white supremacists."[8] While on the House Floor in Washington D.C., Representative Cori Bush called the January 6 incident " a white supremacist Insurrection" and a "domestic terror attack".[9] Adding to the programming, Attorney General Merrick Garland, during his Senate Judiciary Committee on February 22, 2021, described the January 6th incident as "a heinous attack that sought to disrupt a cornerstone of our democracy"  and also elaborated that the individuals involved as

---

[7] Vice President Kamala Harris „ remarks on January 6 anniversary Updated 11:13AM ET, Thu January 6, 2022, https://www.cnn.com/2022/01/06/politics/transcript-kamala-harris-january-6-anniversary-speech/index.html (Last visited October 20, 2024)
[8] Remarks by President Biden at Signing of an Executive Order on Racial Equity, The White House (2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/01/26/remarks-by-president-biden-at-signing-of-an-executive-order-on-racial-equity/ (last visited October 20, 2024).
[9] Rep. Cori Bush Calls Trump "White Supremacists-in-Chief", NBC4 Washington, https://www.nbcwashington.com/news/national-international/rep-cori-bush-calls-trump-white-supremacist-inchief/2540892 (last visited October 20, 2024).

"white supremacists … who stormed the Capitol."[10]

   *Skilling* emphasized "the kind of vivid, unforgettable information the Court has recognized as particularly likely to produce prejudice," when considering the factor of jury partiality. 561 U.S. at 383. The Capitol incident was vivid and unforgettable, placed in the same category as the date that will live in infamy and the deadliest terrorist attack on American soil in U.S. history by Vice President Harris and the imagery replayed countless for the D.C. community.   The media's constant replay of has guaranteed no one can forget those vivid images and the rhetoric.

   The nature and extent of pretrial publicity has created a bias that cannot be cured by the Court through any other means but transferring venue.  Political bias is especially engrained because it has developed over such a long period that the negative publicity solidifies the prejudice.  This is an important consideration in a political case before a jury that has adverse views to the defendant, debating political issues, ideologies, and beliefs hostile to the core beliefs of the jurors.

   The combined elements of D.C.'s prejudiced and polarizing politics, the endless negative pretrial publicity, and the proximity of the publicity and the trial, render the District of Columbia a hostile jurisdiction of Mr. Owens and the venire so greatly prejudiced that a change of venue is necessary to cure the prejudice.

---

[10] Hearing before the U.S. Senate Committee on the Judiciary, Merrick Brian Garland (Nominee for Attorney General), February 22, 2021 (2021), https://judiciary.senate.gov/imo/media/doc/SJC%20Testimony.final.pdf  (last visited October 20, 2024).

## C.  THE PROXIMITY OF PUBLICITY TO TRIAL

In *Skilling*, the case went to trial four years after the highly publicized origination. This case is scheduled to go to trial in April 2025. Local media outlets continue to report Frequently on J6 cases. Recent  sentencing of high-profile J6 defendants, the ongoing civil lawsuits, and the National Guard stories have maintained the J6 rhetoric alive and current in the District of Columbia. With the continued media coverage even years after the event, and the current political election, the J6 cases continue to lead potential jurors' minds.

## IV.    *VOIR DIRE* IS INEFFECTIVE IN WEEDING OUT BIASJURORS, ESPECIALLY IN CASES OF EMOTIONAL PRETRIAL PUBLICITY

The jury is a cornerstone of the American legal system.  Jurors must remain impartial, valuing their life experiences on one hand and acting as blank slates on which litigants paint the case's facts and law on the other.  Pretrial publicity  has increased in frequency and effect as technology advances.  Potential jurors have been known to Google the parties, their attorneys and the media coverage.  The courts have historically preferred *voir dire* of potential jurors to cure the prejudice that comes with pretrial publicity, instead of deciding to transfer venue under FRCP Rule 21 as raised "at or before arraignment." *See United States v. Haldeman*, 559 F.2d 31, 60, 63-64 (D.C. Cir. 1976). However, where the extreme nature and extent of negative pretrial publicity that prejudices the potential jury eliminates the possibility of a fair trial, voir dire is incapable of securing an impartial jury.

While there are cases where gag orders, continuances, time, sequestration, thorough *voir dire,* and other safeguards may detect and eliminate juror bias, this is not

one of those cases. This case is corrupted by negative press coverage and reinforced on a local level.  In *Skilling*, the 5th Circuit Court of Appeals, which heard the defendant's appeal, partially agreed with the defendant and found a presumption of juror prejudice based on: (a) the negative media coverage; (b) co- defendant's guilty plea; and (c) many victims in the greater Houston area. The 5th Circuit, however, did not overrule the trial court because it found that the presumption of jury prejudice had been rebutted by the jury selection process. Specifically, the 5th Circuit held that "the volume and negative tone of media coverage generated by Enron's collapse created a presumption of juror prejudice…. however, that presumption is rebuttable, the court examined the *voir dire*, found it 'proper and thorough,' and [that] the District Court had empaneled an impartial jury."

Studies have shown that voir dire does not weed out biased jurors in cases of emotional pretrial publicity.  *Emotional publicity* is the sensational publicity likely to arouse an emotional response.  Of particular importance is the finding from *On the Effectiveness of Voir Dire in Criminal Cases With Prejudicial Pretrial Publicity: An Empirical Study*, which found that voir dire challenges are insufficient and ineffective at weeding out biased jurors in cases with prejudicial pretrial publicity.[11]  "The net effect of careful *voir dire* concerning pretrial publicity, therefore, was nil, and the bias created by the publicity survived *voir dire* unscathed."[12]  "emotional publicity" cannot be cured, not even through time and continuances.[13] *See Yount*, 467 U.S. at 1031 ("[A]dverse pretrial

---

[11] Kerr, N L, et al. "*On the Effectiveness of Voir Dire in Criminal Cases With Prejudicial Pretrial Publicity: An 64 Empirical Study*", Am. University Law Review, vol. 40, no. 2, 1991, pp. 665–701, https:// www.ojp.gov/library/abstracts/effectiveness-voir-dire-criminal-cases-prejudicial-pretrial-publicity-empirical.
[12] *Id*. at 697.
[13] Id. At 675

publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed).

The community prejudice in D.C. is fed daily by the unprecedented amount of political and media commentary on the criminal case and the staggering amount of emotion that charged the 2020 Presidential election.  Nothing about the pretrial publicity and community prejudice in this case are similar in scope or magnitude to any local case in the past. To expect that a careful voir dire, sequestration, of other principles of protection as used in prior D.C. publicity cases would be constitutionally sufficient to preserve the Mr. Owens' Fifth and Sixth Amendment rights to an impartial jury would be fantasy.

This matters in jury selection, where counsel and the Court rely, to a large extent, on juror self-reporting. Under these circumstances, a fair trial for Owens  is  simply improbable in light of the community prejudice and highly polarized environment of the Washington D.C. community.  Rule 21(a) only requires a showing of a "great" prejudice against the defendant. This case easily satisfies the showing of great prejudice.

Therefore, the totality of the circumstances render the D.C. Circuit's usual practice of deferring a motion for transfer until after *voir dire* insufficient to protect Mr. Owens' constitutional rights.  Instead, it may  result in a false sense of security with a jury panel that is  inherently incapable of unbiased adjudication.   Further, the presumptive cost, inconvenience and delay in securing a fair jury is a strong factor supporting a change of venue. Finally, the appearance of propriety also weighs heavily for  transferring  the  venue  for  this  case.   The  only  remedy  sufficient  to  cure  the

prejudicial pretrial publicity and community prejudice against the defendant is to transfer this matter to an appropriate alternative venue.

## V.   APPROPRIATE ALTERNATIVE VENUE

The appropriate alternative venue must provide for a fair trial by an impartial jury. In *United States v. McVeigh,* 918 F. Supp. 1467, 1470 (W.D. Okla. 1996), the prosecution (led by Merrick Garland) did not object to the Defendant's Motion for change of venue, and instead suggested the case be moved to the Northern District of Oklahoma in Tulsa.  The Oklahoma District Court was left to decide whether the appropriate alternative venue should be another district within Oklahoma, as suggested by the prosecution, or if another district would be an appropriate alternative venue.  The Court noted that the media coverage in Oklahoma compared with the national news coverage was staggering in terms of volume and focus.  The Court also noted  that over time, Oklahoma's news coverage remained focused throughout the state on the aftermath with individual stories of grief, recovery, and community spirit.  This was contrasted to national news coverage that waned. The Court ruled that the ―emotional burden of the explosion and its consequences‖ and the community prejudice against the defendants accused of the bombing in Oklahoma City was so great that they could not obtain a fair and impartial trial *in* Oklahoma. *United States v. McVeigh,* 918 F. Supp. 1467, 1470 (W.D. Okla. 1996) ("There is no disagreement among the parties with Judge Alley's concern about a trial in Oklahoma City. The effects of the explosion on that community are so profound and pervasive that no detailed discussion is necessary.")[14]

---

[14] McVeigh's case was transferred to the District of Colorado, where he was ultimately convicted and sentenced to death

A.    <u>**Western or Eastern District of Missouri**</u>

While the Court can consider many alternative venues for this case in a vacuum, the appropriate alternative venue for this case that also considers the considerations in FRCP Rule 21 (b) is the U.S. Western or Eastern District of Missouri. These communities are much larger than Washington D.C., have a community of varied political viewpoints and is also a convenient forum since Owens resides there, and witnesses for the Owens' defense also reside in the Western or Eastern District of Missouri as well as the defense attorneys.

While pretrial publicity was as prevalent in Missouri as it was nationwide, it did not compare to the level of political publicity experienced in Washington D.C., nor was the community prejudiced through a curfew, the closure of their streets, or through continuous National Guard presence all blamed on the J6 defendants. Missouri residents have not been warned that domestic terrorists are threatening their homes. Missouri  is not an insulated and nearly homogenous political community. Missouri residents are not employed by the federal government in statistically significant rates. The parties are significantly more likely to find an unbiased jury panel in a community where media exposure to the case is more limited and the jury pool more diverse.

<u>**CONCLUSION**</u>

This case is nothing less than historic. Owens has demonstrated that he faces insurmountable prejudice in the District of Columbia, prohibitive of an impartial jury. He has rightfully invoked his constitutional guarantee to a fair trial by an impartial jury under the Sixth Amendment, and aptly requests a transfer of venue to the Western District of

Missouri under Rule 21(a) and/or (b) of the Federal Rules of Criminal Procedure. Under the *Skilling* analysis, Owens has demonstrated presumed prejudice considering the unique size and characteristics of the D.C. community from which the jury pool originates, the nature and extent of the pretrial negative publicity, and the proximity of that publicity to the trial.  Prejudice, or the appearance of prejudice, or the logistical difficulties involved in dealing with prejudice are legitimate factors favoring transfer  under Rule 21 (B) in the interest of justice.  The Court should not wait for voir dire to commence before considering a transfer of venue. A case of this magnitude, where the community prejudice is so high, should be transferred now. If the Court waits until voir dire commences, any postponement of voir dire could reset the case for months.

**WHEREFORE**, Mr. Owens respectfully moves this District Court grant motion, as detailed above.

Respectfully submitted,

*/s/ Angela Williams*
Angela Williams, MO 52190
Federal Public Defenders
Western District of Missouri
1000 Walnut Suite 600
Kansas City, MO 64106
816-471-8282
Angie_williams@fd.org

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing was electronically noticed through the CM/ECF system to the US Attorney's Office  on this  21st day of October 2024:

*/s/Angie Williams*